IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BENCHMARK INVESTMENTS LLC (d/b/a KELLY BENCHMARK INDEXES), | § § § § | No. 378, 2025 |
| Plaintiff Below, Appellant, | § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § | C.A. No. N23C-03-171 |
| PACER ADVISORS, INC., | § § § | |
| Defendant Below, Appellee. | § § § | |

Submitted: February 4, 2026
Decided: April 30, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED AND REMANDED**.

Elizabeth A. Sloan, Esquire, Emily C. Friedman, Esquire, BALLARD SPAHR LLP, Wilmington, Delaware; Gregory M. Williams, Esquire, (*argued*), Jacquelyn E. Fradette, Esquire, SIDLEY AUSTIN LLP, Washington, D.C., *for Plaintiff Below, Appellant Benchmark Investments LLC*.

Michael W. McDermott, Esquire, (*argued*), David B. Anthony, Esquire, Zachary J. Schnapp, Esquire, BERGER MCDERMOTT LLP, Wilmington, Delaware, *for Defendant Below, Appellee Pacer Advisors, Inc.*

**SEITZ**, Chief Justice:

Benchmark Investments, LLC hired Pacer Advisors, Inc. to serve as an investment advisor and servicer for Benchmark's exchange-traded funds. Section 6(c)(i) of their agreement gave Benchmark a without-cause termination right at the end of the term after written notice to Pacer. Also, under Section 6(c)(ii), Benchmark could notify Pacer of "its intent to terminate the Agreement in accordance with subsection 6(c)(i)" and propose a reorganization of the funds.

Benchmark notified Pacer of its "intent to terminate" their agreement and proposed a reorganization plan. After the reorganization plan was not approved, Pacer informed Benchmark that it "accepted" Benchmark's termination of their agreement. Benchmark disagreed that it had terminated the agreement. It responded that Benchmark's notice of intent to terminate under Section 6(c)(ii) was not the same as a notice of actual termination under Section 6(c)(i). In other words, it was only an intent to terminate, not an actual termination.

The Superior Court held that Benchmark's notice of intent to terminate caused an actual termination of the parties' agreement when the reorganization plan was not approved. On appeal, Benchmark argues that a notice of intent to terminate is not the same as an actual termination. We agree. The court should have granted Benchmark's motion for summary judgment.

I.

A.

Benchmark Investments, LLC, operating as Kelly Benchmark Indexes, is a sponsor and index provider for exchange traded funds ("ETFs" or "funds"). An ETF is an investment fund traded on stock exchanges. It allows investors to buy a basket of assets like stocks, bonds, or commodities without purchasing each asset individually. Businesses like Benchmark design indexes and offer ETFs to invest in those indexes. The Benchmark funds correlate to real estate indexes.[1]

In November 2017, Benchmark signed an ETF services agreement with Pacer Advisors, Inc. ("ETF Services Agreement" or "Agreement").[2] The Agreement followed what is known as a "white label" model.[3] Under a white label model, a sponsor (like Benchmark) pays a service provider and advisor (like Pacer) to host the sponsor's indexes in its own funds.[4] Typically, the service provider receives all

---

[1] App. to Opening Br. at A073 [hereinafter A_] (Am. Compl., dated June 14, 2023, at 1–2 [hereinafter Compl.]).

[2] A084 (*Id.* at 13). *See generally* A037–52 (Agreement).

[3] *Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC*, 431 F. Supp. 3d 176, 189 (S.D.N.Y. 2019).

[4] A037–54 (Agreement). Sponsors choose this route to avoid building a costly ETF infrastructure. *Nasdaq, Inc.*, 431 F. Supp. 3d at 189.

revenue from the funds as a fee until those revenues exceed the service provider's expenses.[5]  Once the funds break even, the parties split the profits.[6]

A white label model also involves an independent trust and fiduciary for the funds' stockholders – in this case, Pacer Funds Trust.[7]  The Trust is separate from Pacer Advisors.  The Trust's board oversees the funds and its advisor.  It also plays a role if the sponsor decides to reorganize the funds.

B.

Section 6 of the ETF Services Agreement addresses term and termination. The Agreement had an initial two-year term that automatically renewed in one-year increments unless terminated for material breach or without cause.  The term provision provides:

> (a)    Initial Term; Renewal.
>
> This Agreement will remain in effect for a period of two years from the commencement of operations of the first Fund to be organized and operated under this Agreement ("Initial Term") and will automatically renew for successive periods of one year (each a "Renewal Term" and together with the Initial Term, the "Term") unless and until terminated hereunder.

The termination for cause provision provides:

---

[5] A040 (Agreement § 2(d)).

[6] The Agreement provided a 50/50 profit split.  *Id.*

[7] A041–42 (*Id.* § 6(c)(ii)); *see also* 15 U.S.C. § 80a–15(a) (governing "[w]ritten contract[s] to serve or act as investment adviser" to "registered investment company[ies]").

(b)     Termination for a Material Breach.

Either party may terminate this Agreement for a material breach by the other party of this Agreement that is not cured within thirty (30) days' notice thereof. Termination of this Agreement will not affect the rights and obligations of the parties arising prior to such termination, and such rights and obligations will survive to the extent necessary to effectuate this Agreement for periods prior to such termination.

The without cause termination provision provides:

(c)     Termination Without Cause.

(i)     This Agreement may be terminated without Cause by Benchmark upon written notice to PACER Advisors, provided that Benchmark shall not have the termination date of the License occur before the end of the Initial Term of the Agreement unless a change of control of PACER Advisors which terminates the investment advisory agreement between the Trust and PACER Advisors is contemplated.

(ii)     In the event that Benchmark gives notice of its intent to terminate this Agreement in accordance with sub-section 6(c)(i), Benchmark shall have the right but not the obligation to propose a reorganization of the Fund or Funds formed and operating hereunder with and into another registered investment company or series thereof. Any such proposal shall be subject to acceptance by the Trust in the sole discretion of the Trust's Board. PACER Advisors agrees that, solely for purposes of this sub-section (c)(ii), it will support any such reorganization proposal that appears to PACER Advisors to be in the best interest of the Fund's (or Funds') shareholders, provided, however, that in the event that the Fund or Funds are reorganized into another registered investment company or series thereof, Benchmark shall pay for all reasonable costs associated with obtaining Board and shareholder approval (if any), associated with such reorganization, and shall pay to PACER Advisors an amount determined according to the formula outlined in Exhibit "C".

5

(iii)    This Agreement shall terminate as to a Fund if the Trust's Board approves the termination of a Fund's use of a Benchmark Custom Index without Cause <u>and</u> the Fund is liquidated.[8]

To summarize, for a termination without cause, Section 6(c)(i) permits Benchmark to terminate the Agreement "upon written notice to" Pacer, but not "before the end of the Initial Term" or any renewal term.  Under Section 6(c)(ii), if Benchmark "gives notice of its intent to terminate the Agreement in accordance with sub-section 6(c)(i)," Benchmark has the option to "propose a reorganization of the Fund."  That reorganization, however, must be accepted by the Trust.  In other words, only Benchmark can terminate the Agreement without cause or give notice of its intent to terminate and propose a reorganization.  Whether reorganization occurs is "in the sole discretion of the Trust's Board."   Section 6 does not address what happens to the Agreement if the Trust does not approve the reorganization.

C.

In 2019, Benchmark and Pacer amended and renewed their Agreement for another two-year term.[9]  The renewal reset the term end date to May 6, 2021.  Under Section 6(c)(i), Benchmark could not terminate without cause before that date.

On November 16, 2020, the president of one of Pacer's subsidiaries emailed Benchmark's founding partner, Kevin Kelly, asking for information on "a newly

---

[8] A041–42 (Agreement § 6) (underlined emphasis in original).

[9] A041 (*Id.* § 6(a)); A053–54 (Amend. to Agreement).

filed lawsuit regarding [Kelly] and Benchmark."[10] According to the email, the lawsuit "use[d] some very strong language including the word fraud."[11] Kelly responded the next day with a three-paragraph email. In the first paragraph, Kelly said the lawsuit was "without merit," but that he could not yet "provide further detail about the filing."[12] The next two paragraphs shifted the topic to termination:

> Please accept this email as written notice of Benchmark's intent to terminate the ETF Services Agreement without cause effective no earlier than May 6, 2021, the end of the Initial Term, pursuant to Section 6(c)(i) of the ETF Services Agreement. Consistent with Section 6(c)(ii) of the ETF Services Agreement, Benchmark intends to present to PACER Advisors and the Board of the ETF Trust a proposal to reorganize the Funds into another investment company that Benchmark believes is in the best interests of the Funds and their shareholders.[13]
>
> We would be happy to engage in discussions with you as the adviser on a plan forward. Thank you!

On April 22, 2021, Kelly sent another email to the Pacer subsidiary's president:

> Please accept this email as advance written notice that, no earlier than May 6, 2021 and pursuant to Section 6(c)(ii) of the ETF Services Agreement, Benchmark intends to present to PACER Advisors and the Board of the ETF Trust a proposal to reorganize the Funds into another investment company. Benchmark believes that such proposal is in the best interests of the Funds and their shareholders.[14]

---

[10] A121 (Email from S. O'Hara to K. Kelly, dated Nov. 16, 2020).

[11] *Id.*

[12] A121 (Email from K. Kelly to S. O'Hara, dated Nov. 17, 2020).

[13] *Id.*

[14] A124 (Email from K. Kelly to S. O'Hara, dated Apr. 22, 2021).

7

After these emails, Pacer continued servicing the funds and collecting fees while attempting to negotiate an extension of the ETF Services Agreement.[15] But relations between the parties soured. Benchmark claimed that Pacer "stymied" the reorganization process and violated their Agreement by working with another index provider to "build a replacement index" for the Benchmark funds that was "as close as possible to the existing Indexes."[16] It also accused Pacer of violating the Agreement by charging Benchmark for its legal costs in defending a subpoena from Benchmark.[17] Benchmark wrote: "This notice of material breach is in addition to Benchmark's prior notice that it was terminating the Agreement without cause and its proposed plan of reorganization."[18] Pacer denied the allegations.[19]

In February 2022, Benchmark provided the reorganization plan to Pacer and the Trust.[20] Pacer informed Benchmark in early October 2022 that it would not support the proposed reorganization because it was not "in the best interests of the

---

[15] App. to Answering Br. at B226 [hereinafter B_] (Pacer's Reply Br. in Support of Its Mot. for Partial Summary Judgment as to Count I and Br. in Opp. to Pl.'s Cross-Mot. for Partial Summary Judgment as to Count I, at 11).

[16] A055 (Email from S. Scheuble to S. O'Hara, dated Apr. 26, 2021); A068 (Email from J. Ramirez to F. Van Dorp, dated Sep. 20, 2022).

[17] B042 (Letter from J. Lamson to J. Ramirez, dated Apr. 1, 2022).

[18] *Id.*

[19] B141 (Pacer's Answer to Compl. at 32).

[20] A135–36 (Letter from K. Kelly to Pacer Trustees, dated Feb. 19, 2022).

8

Funds' shareholders and, therefore, Pacer Advisors [was] not contractually obligated" to support it.[21]  On October 14, 2022, the Trust also determined that it would not support the reorganization proposal.[22]

Later that same day, referring to Benchmark's earlier emails, Pacer notified Benchmark that it "accepted" the "Notice of Termination."[23]  Pacer and the Trust set a termination date of October 31, 2022.[24]  Three days later, on October 17, 2022, Benchmark responded that it "never served a 'notice of termination'" and that, in any event, Pacer did not "have any right to accept or refuse such a notice."[25]  Benchmark also claimed that "Pacer's notice of 'acceptance' constitutes a breach" of the Agreement.[26]  Litigation ensued.

## D.

After a detour to the Court of Chancery, Benchmark filed an amended complaint in the Superior Court alleging breach of contract and breach of the implied

---

[21] A141 (Letter from J. Ramirez to T. Katsiff, dated Oct. 3, 2022).

[22] A128 (Letter from J. Ramirez to J. Scott, dated Oct. 14, 2022).

[23] *Id.*

[24] A154 (Tr. of Apr. 9, 2024 Summary Judgment Hearing).

[25] *Benchmark Invs. LLC v. Pacer Advisors, Inc.*, 2024 WL 3567367, at *3 (Del. Super. July 29, 2024) [hereinafter Op.].

[26] *Id.*

covenant of good faith and fair dealing.[27] In cross-motions for summary judgment, the parties asked that the court declare whether Benchmark's emails to Pacer terminated the Agreement.

The Superior Court granted Pacer's motion for summary judgment. According to the court, the difference between an "intent to terminate" in Section 6(c)(i) and a "written notice of termination" in Section 6(c)(i) was "a distinction without a difference."[28] Pointing to Section (c)(ii)'s use of the phrase, termination "in accordance with sub-section (c)(i)," the court reasoned that "Section (c)(ii) plainly modifies Section (c)(i) and is thus limited by the terms of (c)(i), which broadly states 'written notice,' not 'intent to terminate.'"[29]

The court also held that, under Section 6(c)(i), Benchmark could terminate the Agreement without cause by providing written notice to Pacer and not specify a termination date.[30] It reasoned that Section 6(c)(ii) modified Section 6(c)(i) by linking the "intent to terminate" language to the written notice requirement.[31] The

---

[27] *See generally* A072–119 (Compl.).

[28] Op. at *7.

[29] *Id.*

[30] *Id.* at *7–8.

[31] *Id.*

court found that Section 6(c)(i) applied whether Benchmark provided immediate notice of termination or an intent to terminate later.[32]

The court also found that Section 6(c)(ii) allowed Benchmark to propose a reorganization after providing written notice of termination, but did not grant an independent right to reorganize without a termination notice.[33] Thus, when read together, the court ruled, a termination notice under Sections 6(c)(i) needed to come before a reorganization under 6(c)(ii).[34]

Finally, the court held that Exhibit C to the Agreement, addressing Pacer's fees post-reorganization, reinforced its reading that termination and reorganization are separate, consecutive events.[35] Exhibit C referred to Pacer's "elect[ion] to terminate" under subsection (ii).[36] It suggested to the court that termination was a possibility, not a requirement, and that reorganization proposals and board approvals were independent events that might or might not occur.[37] Any other reading, the court found, would render parts of the Agreement meaningless.[38]

---

[32] *Id.* at *8.

[33] *Id.*

[34] *Id.*

[35] *Id.* at *9.

[36] A051 (Ex. C to Agreement).

[37] Op. at *9.

[38] *Id.*

11

The court concluded that Benchmark's emails served as notices of termination under Section 6(c)(i) and that "the termination became effective when the Trust decided on the proposal."[39] The parties and the court eventually configured the trial court proceedings into an appealable judgment.

E.

On appeal, Benchmark argues that its November 17, 2020 and April 22, 2021 emails, which mirrored the language of subsection (ii), expressed only an intent to terminate the Agreement at a future, unspecified date after approval of its reorganization plan. As it argues, the Superior Court erroneously equated a "written notice" of termination under 6(c)(i) with a "notice of intent to terminate" at an unspecified future date under 6(c)(ii).

According to Benchmark, the court erred when it concluded that Benchmark's only way to propose a reorganization was to terminate the Agreement first. Such a result makes no economic sense, Benchmark claims, because it put at risk the assets under management attributable to Benchmark's funds and its intellectual property if the Trust did not approve the reorganization. At bottom, Benchmark argues that the court erred by not treating Section 6(c)(ii) as an alternative path to terminating the

---

[39] *Id*.

Agreement in the future that did not become effective unless Benchmark gave actual written notice of termination.

"This Court reviews the Superior Court's summary judgment decisions and contractual interpretation *de novo*."[40] In doing so, we must "determine whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law."[41]

## II.

It is settled that "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[42] The Superior Court should have granted Benchmark's summary judgment motion because the ETF Services Agreement unambiguously provides that Benchmark could give Pacer a notice of intent to terminate the Agreement and propose a reorganization without causing a present termination. The court's contrary reading

---

[40] *SARN SD3, LLC v. Czechoslovak Grp. A.S.*, 326 A.3d 1170, 1188–89 (Del. 2024).

[41] *State Farm Mut. Auto. Ins. Co. v. Patterson*, 7 A.3d 454, 456 (Del. 2010) (quoting *Brown v. United Water Delaware, Inc.*, 3 A.3d 272, 275 (Del. 2010)).

[42] *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

(a) fails to give meaning to the different words in subsections (i) and (ii); (b) overreads the words "in accordance with" in subsection (ii); (c) incorrectly fixed the termination date; and (d) results in an economic forfeiture inconsistent with the financial relationship of the parties to the Agreement.

A.

Under Delaware law, when interpreting the same contract terms, there is a presumption of consistent usage, meaning that "absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract."[43] The inverse is also true – "the use of different language in different sections of a contract suggests the difference is intentional—*i.e.*, the parties intended for the sections to have different meanings."[44]

The parties chose different language in each of Sections 6(c)(i) and (ii). Section (i), addressing without cause termination, used the words "upon written notice." Section (ii), addressing termination and reorganization, used the words "notice of its intent to terminate." The difference between the word choices is apparent – written notice means notice of an actual termination, while an intent to

---

[43] *JJS, Ltd. v. Steelpoint CP Holdings, LLC*, 2019 WL 5092896, at *6 (Del. Ch. Oct. 11, 2019) (quoting *Comerica Bank v. Glob. Payments Direct, Inc.*, 2014 WL 3567610, at *11 (Del. Ch. July 21, 2014)).

[44] *Soleimani v. Hakkak*, 2024 WL 1593923, at *6 n.75 (Del. Ch. Apr. 12, 2024) (quoting *Williams Cos., Inc. v. Energy Transfer LP*, 2020 WL 3581095, at *12 n.123 (Del. Ch. July 2, 2020)), *aff'd,* 327 A.3d 1060 (Del. 2024).

terminate means the actual termination is expected in the future. To terminate the Agreement, Benchmark had to provide Pacer written notice under subsection (i) that it was terminating the Agreement.[45]

Benchmark's emails providing a "notice of its intent to terminate" under Section 6(c)(ii) did not terminate the Agreement. To terminate, Benchmark had to provide a further written notice under Section 6(c)(i).

## B.

The Superior Court's contrary reading relies on language in (c)(ii): "in accordance with sub-section 6(c)(i)." But those words cannot bear the weight of the Superior Court's interpretation. The court held that the foregoing language turned an "intent to terminate" under Section 6(c)(ii) into an actual termination under Section 6c(i). As noted above, however, when the parties choose different words in a contract, the court's aim is to give meaning to the differences and harmonize Sections 6(c)(i) and (ii).[46]

---

[45] *See, e.g.*, *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *12 (Del. Ch. Feb. 27, 2020) ("[T]he language did not require a notice of termination, only notification of an *intent* to terminate." (emphasis in original)); *Portfolio BI, Inc. v. Djukic*, 2024 WL 887047, at *5 (Del. Ch. Feb. 29, 2024) (finding "use of the term 'notice' does not mean a 'formal termination notice'" because "[t]he parties required this 'formal termination notice' in [one document] but only required 'notice'" in another document).

[46] *Thompson St. Cap. Partners IV, L.P. v. Sonova U.S. Hearing Instr., LLC*, 340 A.3d 1151, 1167 (Del. 2025) (courts should interpret contract provisions "harmoniously").

Here, the language differences and subsections (i) and (ii) are easily harmonized and given meaning. Subsection (i) addresses a termination without cause. An example of a without-cause termination notice would be: "Benchmark notifies Pacer under Section 6(c)(i) that it terminates the ETF Services Agreement effective at the end of the Term of the Agreement." Subsection (ii) addresses a different scenario whereby Benchmark expresses its intent to terminate the Agreement under subsection (i) sometime in the future while also proposing a reorganization.

Benchmark need not commit to an actual termination because a reorganization is subject to third party approval. If the reorganization plan is approved, Benchmark must give written notice of termination under subsection (i). If the reorganization is not approved, then no termination has occurred, and the parties revert to their current arrangement until Benchmark either terminates the Agreement under subsection (i) or the Agreement automatically renews for another one-year term.

That is what should have happened here. Benchmark notified Pacer of its intent to terminate the agreement under subsection (i). It then proposed a reorganization. When the reorganization was not approved, and Benchmark did not

16

give a written notice of termination under subsection (i), the parties reverted to the term and termination provisions of the Agreement. [47]

## C.

The Superior Court's analysis also trips on the termination date issue. The court held that "the termination became effective when the Trust decided on the proposal."[48] But nothing in the Agreement supports the court's termination date. On appeal, Pacer does not defend this aspect of the court's decision. It also has abandoned its position below that the termination occurred when Pacer "accepted" Benchmark's intent to terminate. Our "no present termination" interpretation of subsection (ii) is the only one that squares the termination date with the Agreement – when Benchmark provides an actual notice of termination under subsection (i).

There are other problems caused by the Superior Court's interpretation. By treating a subsection (ii) notice as a present termination, unanswered questions arise about standing to propose reorganization after termination, the duration of post-termination obligations, and what happens if no proposal is presented or if Pacer

---

[47] Exhibit C is consistent with this reading. Exhibit C set forth a compensation formula "[i]n the event Benchmark elects to terminate . . . and in connection with such termination proposes a reorganization . . . ." The Superior Court reasoned that language meant that a reorganization plan must follow termination. Exhibit C applies, however, only if "Benchmark receives Board approval for its proposal(s) . . . ." A051 (Ex. C to Agreement). It presupposes a termination because it assumes a successful reorganization. It does not require Benchmark to terminate no matter the outcome of the reorganization. The court's reading of Exhibit C is inconsistent with this provision.

[48] Op. at *9.

fails to cooperate. The Agreement has no answers to these questions because the parties did not contemplate that a notice of intent to terminate under subsection (ii) caused a present termination under subsection (i).

Additionally, according to Pacer, upon termination, it retains the Funds and the assets under management, without continuing to pay Benchmark.[49] The Agreement is contrary to this outcome. Section 6 provides that Benchmark can (a) terminate at the end of the term and walk away under 6(c)(i); (b) propose reorganization under 6(c)(ii) with compensation to Pacer if approved; or (c) the Trust Board can end use of the Benchmark index and liquidate the Funds under 6(c)(iii). If Pacer supports that third termination path, 6(c)(iv) triggers compensation to Benchmark. The Agreement does not authorize Pacer to essentially "fire" Benchmark and continue hosting the Funds without liquidating and without paying Benchmark. Yet that is what the Superior Court's ruling allows.

D.

Finally, the Superior Court's reading produces an unreasonable result. When interpreting contracts, it is important to read the relevant provisions in the context of

---

[49] Answering Br. 21 ("Benchmark is plainly required to *first* give written notice in accordance with Section 6(c)(i) *before* the 'fate' of a Benchmark-proposed reorganization can even be considered under Section 6(c)(ii)." (emphasis in original)); *id.* at 23 (saying Benchmark's notices caused it to "'walk away' and no longer provide its custom indexes for use by the Funds.").

the business relationship reflected in the Agreement.[50]  Benchmark hired Pacer as a service provider.  Like a house sitter for a house, Pacer serviced the funds but did not control the funds or Benchmark's indexes.  Benchmark also had exclusive control over terminating the advisor.  The parties' arrangement makes no economic sense if Benchmark had to terminate the Agreement before it could propose a reorganization to replace its advisor.  The reorganization was subject to approval by the Trust.  To terminate the Agreement first would mean that Benchmark's capital investment and future profits were lost if it sought to replace its service provider and the Trust did not approve the reorganization.  In other words, the house sitter would end up owning the house.  But that is the outcome if Section 6(c)(ii) is read to cause a present termination under subsection (i).

## III.

Benchmark provided written notice to Pacer under Section 6(c)(ii) of the ETF Services Agreement that it intended to terminate the Agreement.  Its notice did not cause a present termination of the Agreement.  Instead, it signaled an intent to terminate at a future date.  When its reorganization plan was not approved, and

---

[50] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A. 3d 912, 913–14 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."); *see also Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1277 (Del. 2025) ("An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'" (quoting *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021))).

Benchmark did not provide written notice of termination under subsection (i), the parties reverted to the Agreement's term and termination provisions. The Superior Court's judgment is reversed. On remand, the court should grant Benchmark's summary judgment motion and proceed consistent with this opinion. Jurisdiction is not retained.